IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BRUCE W. RAMSEY,
                Plaintiff,

v.                                        Civil Action No. 1:04cv68

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant.

**MEMORANDUM, OPINION and REPORT AND RECOMMENDATION
SOCIAL SECURITY**

**I.  Introduction**

A.    Background

    Plaintiff, Bruce W. Ramsey, (Claimant), filed his Complaint on April 14, 2004 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on July 23, 2004.[2]  Claimant filed his Motion for Summary Judgment and Brief in Support Thereof on September 1, 2004 and September 3, 2004 respectively.[3]  Commissioner filed her Motion for Summary Judgment and Brief in Support Thereof on October 1, 2004.[4]

B.    The Pleadings

        1.       Claimant's Motion for Summary Judgment and Brief in Support Thereof.[5]

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket Nos. 12 and 14.

[4] Docket No. 15.

[5] Docket Nos. 12 and 14.

2. <u>Commissioner's Motion for Summary Judgment and Brief in Support Thereof.</u>[6]

C. <u>Recommendation</u>

1. I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED. The ALJ was substantially justified in his decision. Specifically, the ALJ's RFC assessment properly accounted for Claimant's vision problems and headaches.

## II. Facts

A. <u>Procedural History</u>

On July 12, 1996 Claimant filed for Disability Insurance Benefits (DIB) and Social Security Income (SSI) payments alleging disability since January 7, 1994. The application was denied initially and on reconsideration. The Claimant's applications were remanded to the state agency. A hearing was held on November 3, 1998 before an ALJ. The ALJ's decision dated January 22, 1999 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council remanded the Claimant's applications to the hearing level.

Claimant filed a second disability claim on June 19, 2001. The two claims have been consolidated for adjudication. A hearing was held on September 12, 2001 before an ALJ. The ALJ's decision dated May 13, 2002 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on February 9, 2004. This action was filed and proceeded as set forth above.

---

[6] Docket No. 15.

B.    Personal History

Claimant was 43 years old on the date of the September 12, 2001 hearing before the ALJ.

Claimant has a high school education and no relevant past work experience.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability January 7, 1994 - May 13, 2002:

**Robert J. Sidow, M.D., 3/13/87, Tr. 303**
•    Tear of anterior cruciate ligament right knee.
•    Sprain right knee.

**Shen K. Wang, M.D., 12/8/92, Tr. 304-305**
•    Dr. Bowers, M.D., of Morgantown opined there is no need for reconstruction of the cruciate ligament.  Obvious anterio-posterior instability of the right knee.  Walks without a limp.  General physical examination lies essentially within normal limits.

**Frederec B. Kremer, M.D., 6/23/93, Tr. 311**
•    Radial Keratotomy

**Fairmont General Hospital, 4/27/94, Radiology Tr. 359**
•    Normal cervical spine.
•    Left wrist, the bony structures, and soft tissues are within normal limits.

**5/24/91, Tr. 363**
•    Right foot.  The bony structures and soft tissues are intact.  I do not see evidence of acute fracture at this time.

**J. Daristolle, M.D., Tr. 370**
•    Left tripod fracture.

**P. Kent Thrush, M.D., 9/24/91, Tr. 379**
•    Old tear anterior cruciate ligament.

**F.R. Franyutti, M.D., 9/25/91, Tr. 380**
•    Synovial tissue showing edema, congestion, chronic inflammation and accompanying portions of degenerated cartilage, from the right knee.

**J. Patrick Goley, 9/12/95, Tr. 390**
•    Anterior cruciate deficient knee but also has evidence of medial ligament instability.  Can

get a knee brace.  Can only do sedentary job.

**Manchin Clinic, 7/2/96, Tr. 416**
IMPRESSION:                Degenerative changes at L5-S1.  (724.5)
IMPRESSION:                Bilateral pars defects at L5.
•        Broad-based central disc herniation which deforms the ventral thecal sac at L5-S1.
        Myelogram or MRI scan may be of benefit in further evaluating the relationship between
        the L4-5 and L5-S1 disc with the thecal sac and neural elements.  (724.5)

**10/21/94, Tr.  417**
IMPRESSION: Bilateral spondylolysis with minimal Grade I anterior listhesis  (724.2, 805)
RIGHT SHOULDER: (73030) There is a bond island identified in the humerus.  The bones,
joints and soft tissues are otherwise normal.  (719.4)
LEFT ANKLE: (73110) The bones, joints and soft tissues are normal.  (719.4, 959.7)
IMPRESSION: Bilateral spondylolysis, L5.  No spondylolisthesis.  (724.2).

**3/20/92, Tr. 418**
IMPRESSION:Bilateral spondylolysis, L5.  No spondylolisthesis.  (724.2)

**7/5/91, Tr. 420**
•        Conclusion evidence of prior surgery involving the superior lateral left orbital rim.

**1/16/90, Tr. 427**
•        Normal Chest.

**3/28/86, Tr. 432**
•        Chest normal study.

**4/13/86, Tr. 435**
•        Moderate loss in respiratory functional capacity.

**Alex Ambroz, M.D., 8/1/96, Tr. 443-447**
IMPRESSION:  Status post torn ligament right knee.
ASSESSMENT: Physical examination did not reveal severe deficits.

**X-Ray Report, 7/30/96, Tr. 450**
•        Negative examination of the chest.
•        Negative examination of the right knee.

**Residual Physical Functional Capacity Assessment, 8/15/96, Tr. 453-460**
PRIMARY DIAGNOSIS:     ACL deficiency right knee.
SECONDARY DIAGNOSIS: Lumbar disc disease.
EXERTIONAL LIMITATIONS:     Occasionally and frequently 10 lbs., stand and walk
                                6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.

4

POSTURAL LIMITATIONS:          All occasionally.
MANIPULATIVE LIMITATIONS: None established.
VISUAL LIMITATIONS:            8/1/96 w/o glasses, 10/70 bilat.
COMMUNICATIVE LIMITATIONS: None.
ENVIRONMENTAL LIMITATIONS: Avoid concentrated exposure to hazards.

**Residual Physical Functional Capacity Assessment, 10/22/96, Tr. 463-470**
PRIMARY DIAGNOSIS:             S/POST eye surgery stable.  Knee, back and neck, sight
loss, black lung, age 38.
EXERTIONAL LIMITATIONS:        Occasionally and frequently 10 lbs., stand and walk 6 of 8
hours, sit 6 of 8 hours, unlimited push and pull.
POSTURAL LIMITATIONS:          All occasionally.
MANIPULATIVE LIMITATIONS: None established.
VISUAL LIMITATIONS:            None established.
COMMUNICATIVE LIMITATIONS: None established.
ENVIRONMENTAL LIMITATIONS: All unlimited except avoid concentrated exposure to
extreme cold, extreme heat and hazards.

**Residual Functional Capacity Assessment, 9/8/97, Tr. 488-495**
PRIMARY DIAGNOSIS:     Knee pain.  Knee, back, neck, sight loss, back, lung symp. pain.
EXERTIONAL LIMITATIONS:        Occasionally and frequently 10 lbs., stand and walk
6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
POSTURAL LIMITATIONS:          All occasionally.
MANIPULATIVE LIMITATIONS: None established.
VISUAL LIMITATIONS:            None established.
COMMUNICATIVE LIMITATIONS: None established.
ENVIRONMENTAL LIMITATIONS: Unlimited except avoid all exposure to hazards and
moderate exposure to vibration.

**J. Patrick Galey, M.D., 9/20/94, Tr. 497-498**
•       Anterior cruciate deficient knee and also evidence of medical ligament instability.  Could
        do sedentary job only.

**Fairmont General Hospital MRI Report, 1/24/98, Tr. 499**
IMPRESSION: Joint effusion.  Degenerative changes of the meniscus without frank tear.  I
cannot see or identify the anterior cruciate on this study.

**1/19/98, Tr. 547**
IMPRESSION: No intraorbital metallic foreign body. Old injury of the left orbit is transfixed
with side plate and screws.

**Physician's Summary, 9/9/96, Tr. 513**
•       Old ACL tear, right knee, cartilage defect patella unable to do heavy labor, would be
        capable of light sedentary work.

**X-Ray Report, 1/2/98, Tr. 525**

LEFT HIP:          (73510) Multiple projections of the left hip show no acute bone or joint abnormality. There is a bond island in the subcapital area of the left femur and possibly 2 small ones in the acetabulum. (959.6)

LEFT KNEE:      (73562) Multiple projections of the left knee show no fracture or dislocation. (959.7)

**Psychiatric Review Technique, 4/10/98, Tr. 526-534**
•      No medically determinable mental impairment.

**Physical Residual Functional Capacity Assessment, 5/20/98, Tr. 535-542**

PRIMARY DIAGNOSIS:        ACL deficiency, right knee strain.

SECONDARY DIAGNOSIS:     Lumbar disc disease.

EXERTIONAL LIMITATIONS:     Occasionally and frequently 10 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.

Postural Limitations: No ladder, rope, scaffolds, kneeling, crawling. All others occasionally.

MANIPULATIVE LIMITATIONS: None established.

VISUAL LIMITATIONS:         Limited near and far activity 20/60, 20/70.

COMMUNICATIVE LIMITATIONS: None established.

ENVIRONMENTAL LIMITATIONS: Unlimited except no extreme cold, vibration or hazards.

**Manchin Clinic, X-ray, 7/8/98, Tr. 556**
•      Intact left ribs.

**Fairmont Clinic, X-ray, 11/24/98, Tr. 573**
•      Lumbar spine - no significant bony abnormality demonstrated.
•      Left knee, right knee - no significant bony abnormality demonstrated.

**Ronald D. Pearse, Ed.D., 12/2/98, Tr. 576**

AXIS I:        305.00 Alcohol Abuse

AXIS II:       V62.89 Borderline Intellectual Functioning

AXIS III:     Vision acuity deficits, chronic pain

**Medical Assessment of Ability to do Work Related Work Mental, 12/10/97, Tr. 580-582**

OCCUPATIONAL ADJUSTMENTS:     1 good, 3 fair, 3 poor

PERFORMANCE ADJUSTMENTS:     1 good, 2 fair, 1 poor

PERSONAL SOCIAL ADJUSTMENTS:     1 good, 1 fair, 2 poor

**Fairmont General Hospital, MRI Left Knee, 7/6/99, Tr. 595**
•      Degenerative changes of the menisci without evidence of tear.
•      Disruption of the anterior cruciate ligament is suspected. I can't rule out the possibility of post-surgical changes. There is no evidence of a joint effusion at this time.
•      There appears to be some thinning of the articular cartliage of the patella.

**Manchin Clinic, X-ray, Tr. 596**

- Unremarkable left knee.

**Toni B. Goody Koontz, M.D., 11/12/99, Tr. 612**
AXIS I:        Major depressive disorder recurrent.

**William Fremouw, Ph.D., 10/19/01, Tr. 638-**
- Binge Alcoholic.
AXIS I:        305.00 Alcohol abuse.
                296.31 Major depression, recurrent - mild.
AXIS II:       V62.89 Borderline intellectual functioning.
AXIS III:      Knee problems, back problems, and problems with visual acuity.

**Medical Source Statement of Ability to do Work Related Activities - Mental, 10/19/01, Tr. 643-644**
INSTRUCTIONS: 2 slight, 3 moderate.
RESPOND APPROPRIATELY: 5 slight.

**Medical Source Statement of Ability to do Work Related Activities - Physical, Tr. 649-652**
Exertional Limitations: Occasionally 20 lbs., frequently [illegible] lbs., standing and walking less than 2 of 8 hours, sitting less than 8 hours, limited push and pull in lower extremities.
POSTURAL LIMITATIONS:        All frequently.
MANIPULATIVE LIMITATIONS:  Unlimited.
VISUAL LIMITATIONS:        Only seeing limited.
COMMUNICATIVE LIMITATIONS: Only seeing limited.
ENVIRONMENTAL LIMITATIONS: Temperature extremes, humidity, fumes, hazards limited.

**Fairmont Clinic X-ray, 10/10/01, Tr. 654**
Chest.
IMPRESSION:        No acute cardiopulmonary disease. Bilateral Knees.
IMPRESSION:        No significant bony abnormality demonstrated.

**Fairmont General Hospital, 2/21/03, Tr. 686**
AXIS I:        Organic hallucinosis.
AXIS II:       Deferred.
AXIS III:      Medical Problems - As per History & Physical Examination.
AXIS IV:       Severity of Stressors - severe; lack of primary support group.
AXIS V:        Global Assessment of Functioning - 35.

D.  Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 725,

728-32, 768, 771-73):

Q       All right.  We're here today to tell the Judge about your physical impairment.
Would you begin by telling the Administrative Law Judge about your back pain?  Where is your
back pain?

A       It's in my lower back.

Q       And how often do you suffer from this pain?

A       I can suffer from it once a week, couple times a month, and it lasts up to two
months at a time.

Q       Would you describe the pain?

A       It's a numbing.  I get tingling feelings down my legs where, you know, I have no
feelings, you know, in my legs.

                    *               *               *

Q       Okay.  Does the back pain that you have affect your ability to sit or stand?

A       Yes, Yes, it does.  I have to - -

Q       Describe that.

A       I would have to make, you know, different movements, you know.  If I sit for a
period of time, it starts acting up.  Then I have to, you know, maybe lay down on the floor.  You
know, instead of a bed, what's soft, I have to get someplace where it's - - you know, the floor,
have to be solid.

Q       Um-hum.

A       And - - or just make some kind of different kind of, you know, sitting position.

Q       Are there often, or are there ever times when you have to lay down on the floor

for long periods of time?

A      Yes, it is.

Q      Okay.  How long do you typically have to lay on the floor to get relief?

A      Oh, I've laid there all night, just to get relief.

Q      Okay.  So is it typical for you to have to lay on the floor for several hours?

A      Yes.

Q      All right.  Now, you also have some knee problems.  Would you describe that - - excuse me - - for the Judge, please?

A      Yeah, I got hurt in the mines, July of '91, and I was off for about a year.  And I had surgery done, and ever since then, it's been - - gave out on me a number of times, and it hurts all the time.

Q      Which knee are we talking about?

A      It's my right knee.

Q      You also have problems with your left knee?

A      Yeah, I hurt my left knee, tore ligaments in my left knee this year.  And it's - -

Q      What sort of problems do you have with that?

A      A lot of pain.

Q      Okay.

A      And it gives away.  You know, you just got to be careful just how you walk.  And if I - - you know, at that time, I was - - I relied on my left leg to carry me.  Now, I got two of them and I just got to be careful walking down hills, walking down steps, walking in gravel.

*       *       *

Q       Is the pain in your knees with you all the time?

A       Yeah.

Q       Would you describe that pain, please?

A       It's like a knifing pain, just somebody just seem to grind it.

Q       Does the problem with your knees cause you problems in standing in one place?

A       Yeah.

Q       Describe that.

A       It just - - the longer I stand, more of an aching pain and more of a real sharp pain. It becomes sharper, longer I stand.

Q       How long are you able to stand before you begin to have these problems?

A       Oh, I - - soon as I stand up, I can tell the difference.  I mean it starts, right then.

Q       Okay.  Well, how long is it, typically, before you have to sit down and get some kind of relief?

A       Well, I'll sit down as soon as I get the opportunity.

Q       Okay.

A       You know, as soon as I walked down here into the building, you know, I see - - well, I sat down as soon as I could.

                           *              *                *

Q       All right.  Now, there's also some medical evidence about your eyesight.  Would you describe that for the Judge, please?

A       Well, I got bad vision and far-sightedness, near-sightedness, night vision.

Q       Well, are you able to see close-up?

A       Not very good.

Q       Can you read very well, for example?

A       No, I can't.

Q       Okay.  And why not?

A       Well, there's - - I - - well, I just can't.

Q       Okay.  It is because - -

A       With the lighting - - got to have - - I got to have real good lighting, and the print's got to be real big.

Q       So you don't read very well because you can't see?

A       Right.

Q       Do you have problems, sometimes, with the words reversing themselves or something like that?

A       Yes.

Q       Describe that, please.

A       If I'll be - - you know , if - - like, if I'm looking at something, it'll move on me. And sometimes, I see the words backwards.

Q       Are you able to read a newspaper?

A       No, not very well.

Q       Okay.  How about looking at your watch?  Can you look at our watch and see what time it is?

A       No.

Q       Okay.  You were about to say something and I interrupted you.

A     Well, like, looking at a - - you know, like paragraphs, you know, you got a couple paragraphs on a page. Like, that paragraph will sometimes - - it's - - well, they call it a ghost vision, like a shadow come off the - - you know, off the words.

Q     And - -

A     It'll move. That's what moves on me. Like, it's - - it's not like double-vision. It's like - - it's a ghost vision. There's a shadow there that moves thing on me.

Q     Okay. How about far away? Can you see far away?

A     Well, my vision is, I believe, 20/60 in my left eye and 20/80 in my right eye. And - -

Q     Does that improve with glasses?

A     No, it won't improve.

Q     All right. How about seeing, for instance, road signs? Can you see them to read them?

A     No. If I don't know where I'm going, like - - you know, if - - I wouldn't be able to come up - - you know, if I'd been up here a few different time, I would know where I'm going. You know, if I had to come up here to read the signs, you know, I wouldn't be able to do it.

Q     Okay. Did you bring yourself here today?

A     No.

Q     Who brought you?

A     My ex-wife.

Q     All right. Now, there's also an issue with headaches. Would you describe - - do

you have headaches?

A    Yes, I do.

Q    How often does that happen to you?

A    Well, it'll vary.  Well, just - - we can take this week.  I had it for Thursday,

Friday, got a break Saturday, had it Sunday and Monday.

Q    Would you describe how the headaches feel?

A    They feel like a - - just a great big hole, you know, just real high, intense above

one eye or the other, and comes out, like, in the back of my head.  That's where the most intense

pain is.  Then, you know, the rest of my head, you know, just hurt.  My eyes hurt, you know, but

it's like - -just like a great big hole going right   through my head.  Just real high, intense pain.

Q    Can you give us an idea - - I think I asked you this, but I need to ask you again.

Can you give us an idea of how often this happens?

A    It - - well, twice this week.

Q    Now, is that pretty typical?

A    Yeah.

Q    And how long do these spells last?

A    On this week, it last two days both times, but I have had it last for two weeks at a

time.

                    *            *            *

Q    Okay.  And you mentioned that you have pain in your right knee.  How often do

you have pain in your right knee?

A    Oh, most of the time.

Q    Okay.  Would that be every day you have pain - -

A    Yeah.

                    *          *          *

Q    Okay.  We need to explain to the Judge about your depression.  When did you first notice you were having depression?  Was that when you were working then?

A    No.  It was a few months later.  I just had no energy.  I thought maybe I had leukemia.  My dad had leukemia.  So I had my blood checked.

Q    Um-hum.

A    I didn't know anything about depression.  I might've had it for longer than that, maybe a year or so.

Q    Um-hum.

A    I didn't understand what - - was wrong with me.  I just couldn't get up and do anything.  Didn't want to.  I didn't care.

Q    So you had a lack of energy?

A    Yeah.  I mean I might've had it for a long period of time, but I didn't realize what was wrong until I watched - - I seen it on t.v. - - what they was advertising about depression - - about Prozac and Serzone and it came to my attention maybe that's what's wrong with me.

Q    Okay.  What other symptoms do you have from your depression?

A    Lack of concentration, suicide thoughts, crying spells.

Q    Okay.  How often do you cry a week when you're having a bad week with your depression?

A    Oh, about at least twice a week.

Q        Okay.  Do you have any difficulties being around people?

A        Yeah.

Q        Does being in a room with four other people, such as you are now,  give you a problem?

A        Yeah.

Q        Can you tell us - - can you explain to us what problems you suffer because of that?

A        Well, could you - -

Q        Take your time.

A        - - repeat that question?

Q        Yeah.  What difficulties do you have being around people?

A        It just bothers me.  I'd just rather not be around people.  I just feel out of place, you know.  I just - - I don't feel right.

Q        Okay.  Do you feel - -

A        I like being alone.

Q        Do you feel you have difficulty functioning when there are people around?

A        Yeah.

Q        Okay.  What other physical difficulties do you have?  We've been through your right knee.  What other problems do you have?

A        My back.

Q        Okay.  What can you tell us about your back problems?

A        Well, just I get back spasms and it goes on, you know, for days at a time.  I can't

Sit very long or stand.  I got to lay on the floor.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 801-04):

Q       Mr. Bell, please assume a younger individual with a high school education with ability to read and write, precluded from performing all but sedentary work in a seated - - with a sit/stand option in a controlled environment.  That is, free of excessive amounts of dust, fumes, and pollutants.  No hazards such as dangerous and moving machinery, unprotected heights, unskilled, low stress.  Low stress defined as one and two-step processes.  Routine and repetitive tasks.  Primarily working with things, rather than people, entry-level.  With these additional limitations, could you describe any work this hypothetical individual can perform?

A       Yes, Your Honor.  At the sedentary level, machine tender, 141,000 nationally, 1400 regionally.  And the region's West Virginia, Eastern Ohio, Western Pennsylvania, and Western Maryland.  Or general office clerk, sedentary.  The total number in the national economy is 299,000 and 2900 regional.

Q       Just a second.  Okay.  The jobs you named, Mr. Bell, would you name them again one more time?

A       Yes, Your Honor.  Machine tender.  Do you want the statistics, too?

Q       No.

A       And general office clerk.

Q       Okay.  The machine tender job, would it expose the claimant to machinery - - dangerous, moving machinery?

16

A        Not hazardous machinery, no.  It's basically watching a machine do the job.  For example, like a laminator or a knitting machine, and just - - if it gets stuck, then they have to [INAUDIBLE], but it's not - - it wouldn't be what I would be considered - - what I would consider a dangerous kind of situation at all.

Q        Another question would be regarding vision and this is - - I tried to frame the visual limitation in the hazards, but in a vocal standpoint, have you observed either of these jobs, Mr. Bell, personally?

A        Yes.

Q        Would you say that peripheral vision, for example, to be able to have full view - - full ability to look to see what's to your left and to your right - - from a vocational standpoint, do you see that as a important component of the - - either of these jobs?

A        I don't believe that would be - - that would affect the general office clerk.  It might affect the machine tender because there's a wider area to pay attention to, so I think that would probably be - -

Q        Machine tender, particularly?

A        Yes.

Q        Okay.  Are these jobs consistent with the DOT?

A        Yes, Your Honor.

ALJ        Mr. Ramsey, do you still drive?

CLMT        Yeah.

ALJ        Okay.  And how many miles are you typically driving a week?

CLMT        Well, this winter I haven't drove too many miles.  About 20 miles, 25

17

miles this winter.  The first of the year - -

ALJ          Okay.

CLMT         - - I'm speaking of.

ALJ          Okay.  Ms. Williams?

ATTY         Thank you, Your Honor.  Mr. Bell, would the performance of being an

office clerk be impacted if this hypothetical worker had in addition to the impaired peripheral

vision, if he had difficulty seeing things at arm's length?

VE           Probably so because arm's length is the general length at which you'd be

reading and those kind of general office clerk - - for example, addressing envelopes usually at

arm's length, microfilm or - - those would be - - could be affected if you had to have good vision

at arm's length, yes.

ATTY         Okay.  And also, either of these jobs - - if this hypothetical individual

needed to lie down two to three times a day for 30 to 60 minutes and recline three to four times a

day for 30 to 40 minutes, would either of those jobs be impacted?

VE           That wouldn't allow him to meet competitive standards to maintain

employment.  That wouldn't be tolerated on the job.

ATTY         Lastly, Mr. Bell, if this hypothetical individual had decompensation of

concentration two-third's of the time of the day, would that impact either of these jobs?

VE           Yeah, that would negatively impact both of them.

ATTY         That's all I have of Mr. Bell, Your Honor.  And maybe I should've

pointed out when you asked if I had any objections to the evaluations, I certainly have no

objections to them being entered.  But you did afford me the opportunity to comment on them

and that is contained in the file, as well.  I'd like to note that.  Thank you.

*          *          *

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•        Watches television, listens to the radio.  (Tr. 782).

•        Drives 50 - 150 miles per week.  (Tr. 764).

•        Can fix a sandwich.  (Tr. 753).

•        Goes to the post office.  (Tr. 764).

•        Goes shopping.  (Tr. 765).

•        Sometimes drinks until he passes out.  (Tr. 765).

•        Visits friends and family four times a month.  (Tr. 781-82).

## II.  The Motions for Summary Judgment

A.        Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ failed to properly account for Claimant's vision problems and headaches in the ALJ's Residual Functional Capacity (RFC) assessment.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ's RFC assessment properly accounted for Claimant's vision problems and headaches.

B.        The Standards.

1.      Summary Judgment.      Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.      Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her

insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hayes v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once

claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Social Security - Residual Functional Capacity. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Claimant may be able to do despite their impairments. Id.

C.    Discussion

### 1. Residual Functional Capacity

Claimant asserts that the ALJ failed to include all the functional limitations of Claimant's vision problems and headaches in the RFC assessment. Commissioner counters that the ALJ's RFC assessment properly accounted for Claimant's vision problems and headaches.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the

relevant evidence.  Id.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

The ALJ determined that Claimant retains the RFC "for sedentary exertional level work with a sit-stand option in a controlled air environment with no work around dangerous moving machinery or unprotected heights performing unskilled work that is low stress work with one-two step processes and instructions involving routine/repetitive work with things, not people, at the entry level."  (Tr. 39).  The ALJ determined Claimant's RFC based on objective medical evidence, Claimant's daily activities, and Claimant's credibility.  On August 23, 1996, Dr. Berardi reported that Claimant had 10/60 vision in the right eye and 20/70 vision in the left eye with correction.  (Tr. 28).  On September 29, 1997, Dr. Berardi reported Claimant had 10/60 vision in the right eye and 20/50 in the left with corrected vision and 20/100 and 20/70 respectively with uncorrected vision.  (Tr. 28).  On December 8, 1998, Dr. Selario reported that Claimant had corrected distant vision of 20/70 in the right eye and 20/70 in the left, and corrected near vision of 20/80 in the right eye and 20/60 in the left eye.  (Tr. 28).  On August 15, 2001, Dr. Beradi reported corrected vision of 20/100 in both eyes.  (Tr. 28).  In October 2001, Dr. Wilkinson reported corrected distant vision of 20/70 in both eyes and corrected near vision of 20/50 in both eyes.  The record does not show that any of these doctors evaluated

Claimant for corneal transplant. The record does not indicate that any of Claimant's eye doctors have attempted to rescind his driver's license. Claimant reports watching as much as ten hours of television a day and has reported driving as much as 150 miles per week. (Tr. 764-67). Also, the ALJ stated that "[a]ssuming Snellen Chart testing and similar such chart testing and subjective reporting was used to evaluate the vision, the subjectivity interjected into the results by the claimant's self report of what he is able to view should be considered a possible reason for the wide variations shown." (Tr. 28). Additionally, the ALJ determined that Claimant is not fully credible. (Tr. 35). Based on the foregoing, the ALJ's RFC assessment properly accounted for Claimant's vision problems.

Claimant assets that the ALJ's assessment of Claimant's headaches is not supported by substantial evidence. Commissioner counters the ALJ properly accounted for Claimant's complaints of headaches in his RFC assessment. Dr. Patel treated Claimant with Valium for his tension headaches. (Tr. 30). Claimant "reported that his headaches mainly occurred when he was 'stressed out'". (Tr. 30). Accordingly, the ALJ limited Claimant's RFC to "low stress work". (Tr. 39). Additionally, the ALJ determined that Claimant is not fully credible and Claimant's complaints of crippling headaches are subjective. (Tr. 35). Based on the foregoing, the ALJ's RFC assessment properly accounted for Claimant's headaches.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED. The ALJ was substantially justified in his decision. Specifically, the ALJ's RFC assessment properly accounted for Claimant's vision problems and headaches.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: April 28, 2005

/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE